UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SAMANTHA GILLARD,
LINDA SLAWSON,
SCOTT GILLARD, and
BRITTONY GILLARD,

        Plaintiffs,

      v.                                      Case No. 08-C-1107

AMBER L. ROYER,
DAIRYLAND BUSES, INC.,
SCHOOL DISTRICT OF WAUKESHA,
DISCOVER PROPERTY & CASUALTY INSURANCE COMPANY,
WAUSAU GENERAL INSURANCE COMPANY,
UNITED HEALTHCARE OF WISCONSIN, INC., and
GOVERNMENT EMPLOYEES INSURANCE COMPANY,

        Defendants.

**DECISION AND ORDER**

After the plaintiffs, Samantha Gillard, Linda Slawson, Scott Gillard, and Brittony Gillard, filed a complaint against the above-named defendants in Waukesha County Circuit Court on November 14, 2008, asserting a series of claims related to an automobile collision occurring in May 2007, the defendants, School District of Waukesha ("School District") and Wausau General Insurance Company ("WGIC"), filed a Notice of Removal in the United States District Court for the Eastern District of Wisconsin on December 18, 2008 pursuant to 28 U.S.C. § 1441(a) and (b). The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a)(1) and (2) because the defendants reside in this district and because a substantial part of the events giving rise to the plaintiffs' claims occurred in this district. All parties have consented to the exercise of jurisdiction by a magistrate judge. *See*

28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

On October 1, 2009, defendants School District and WGIC filed a motion for summary judgment, which has been fully briefed and is ready for resolution. For the reasons that follow, the defendants' motion will be granted.

## I. FACTUAL BACKGROUND

For purposes of this summary judgment motion, there is little by way of factual matters about which the parties disagree. Other than the plaintiffs' noted objections to the defendants' proposed findings of fact, all other proposed findings of fact not objected to are deemed admitted. Those undisputed material facts are as follows.

At approximately 6:50 a.m. on May 21, 2007, the vehicle driven by Samantha Gillard collided with the school bus driven by Amber L. Royer ("Royer") as Samantha Gillard attempted to make a left turn into the Waukesha West High School entrance from Saylesville Road. (DPFOF ¶¶ 3, 5.) Immediately preceding the collision, Samantha Gillard was traveling southbound on Saylesville Road, Royer was traveling northbound on Saylesville Road, (DPFOF ¶¶ 1-2), and some high school students were performing the wave near Saylesville Road in the vicinity of the main entrance of the school, (DPFOF ¶ 82). As a result of the collision that occurred on May 21, 2007, Samantha Gillard sustained numerous serious injuries. (PPFOF ¶ 1.)

On the night preceding the collision, May 20, 2007, a senior student campout was held on school grounds. (DPFOF ¶¶ 10, 22.) Prior to that time, Waukesha West High School approved May 20, 2007 as the date for the school campout after Waukesha West High School senior, Colin Oldenburg ("Oldenburg"), worked with Mitchell Weber ("Weber"), the assistant principal for activities and athletics, in coordinating the event. (Pl.'s Resp. to DPFOF ¶ 10.) Weber and Oldenburg did not discuss where the campout would be located. (DPFOF ¶ 14.) After Oldenburg

and Weber discussed the campout, the school's principal, Douglas Strauss ("Strauss"), the assistant principal, Anthony Brazouski ("Brazouski"), Weber, and one of the school's vice principals, Michelle Ferris ("Ferris"), discussed the fact that seniors had run the idea of a senior campout past Weber. (DPFOF ¶¶ 47-48.) Thereafter, Weber reported back to Oldenburg (and possibly two other individuals) that the school approved May 20, 2007 as the date for the campout. (DPFOF ¶ 10; Pl.'s Resp. to DPFOF ¶ 10.) Weber informed students that they were to follow school rules, including rules set forth in the student handbook as well as the policies of the school district and school athletic codes. (DPFOF ¶ 11.)

The school district did not provide students with sanitary facilities, tents, cooking utensils, food, or beverages. (DPFOF ¶¶ 18-21, 33.) However, the school district paid an off-duty City of Waukesha Police Officer, Thomas Wallschlaeger ("Wallschlaeger"), $200 from the "Student Activities Fund" to supervise the campout. (Pl.'s Resp. to DPFOF ¶ 17.) Waukesha West High School's resource officer, Pete Jungbluth, contacted Wallschlaeger about supervising the campout, informing him that the seniors were allowed to camp out overnight in an area by the soccer fields and that his duties were to chaperone and call the City of Waukesha Police Department if any inappropriate activity occurred. (DPFOF ¶¶ 58, 60-61.) Wallschlaeger was also instructed to make sure that students stayed in the basic encampment area. (DPFOF ¶ 61.) Wallschlaeger also recalls being told that the senior campout was not a sponsored event. (DPFOF ¶ 65.)

Wallschlaeger provided security at Waukesha West High School for the senior campout from 10:00 p.m. on May 20, 2007 to approximately 6:20 a.m. on May 21, 2007. (DPFOF ¶ 62.) According to Wallschalaeger, approximately fifty to seventy-five tents were set up at the senior campout. (DPFOF ¶ 64.) He estimated the maximum number of students that attended the campout at any given time to be 300. (DPFOF ¶ 63.) When Wallschlaeger left the school premises on May

3

21, 2007, only one or two students remained at the campout. (DPFOF ¶ 67.)

Between 250 and 300 people attended the campout in May 2007. (DPFOF ¶ 78.)[1] While at the campout, students used soccer nets and goals to block the student and faculty parking lots. (PPFOF ¶ 4.) However, the soccer goals were not blocking traffic on Saylesville Road. (Pl.'s Resp. to DPFOF ¶ 110.) Further, at some point, a bench had also been moved to the median strip near the entrance of the high school near Saylesville Road; however, it was not blocking any portion of the roadway. (DPFOF ¶ 121.) Some of the students were waving at cars as they entered the school premises. (DPFOF ¶ 82.) However, no students stood in the road specifically to block the traffic. (DPFOF ¶ 108; Pl.'s Resp. to DPFOF ¶ 83.) At the time of the accident, students were gathered in the median of the roadway off of Saylesville Road at the main entrance of the school. (PPFOF ¶ 11; Def.'s Resp. to PPFOF ¶ 11.)

Upon arriving at Waukesha West High School on May 21, 2007 at approximately 6:30 a.m., Brazouski observed fifty to sixty students on the soccer field. (DPFOF ¶ 55.) Ferris observed twenty to thirty students in the area between the soccer field and the parking lot as she traveled south on Saylesville Road and turned left onto the school's main entrance road. (DPFOF ¶ 41.) Ferris and Brazouski also observed a vehicle impeding entry to the staff parking lot. (DPFOF ¶¶ 44, 54.) Various faculty members, including Ferris, passed the students gathered at the main entrance of the school, but did not take any action to disperse them. (PPFOF ¶¶ 7-8.) At the time of the accident, there were approximately fifty students at the main entrance, but five minutes before the accident,

---

[1] Other reports from seniors who attended the campout indicate that there were anywhere from 70 to 300 students who attended the campout. (DPFOF ¶¶ 88, 91, 94.) The majority of reports, however, suggest that the range of 250 to 300 students is the most accurate attendance count.

4

there were only twenty students at the main entrance. (Pl.'s Resp. to DPFOF ¶ 95.)[2]

Although it is unclear whether the senior campout was an annual event, senior campouts had occurred in prior years, dating back as early as 1999. (DPFOF ¶¶ 70-71, 73.) Principal Strauss was aware that in years past, seven to twenty-five students arrived at the senior campout between 3:00 and 4:00 a.m. to participate in a senior wave. (DPFOF ¶ 68.) While Weber was aware that in 2005 and 2006, under twenty-five seniors participated in the campout, Brazouski did not have any knowledge of students sleeping overnight on school grounds in 2005 and 2006. (DPFOF ¶¶ 71, 74.)

## II. STANDARD OF REVIEW

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

---

[2] One student reported that at the time of the accident, there were twenty-four to thirty-six students in the area around the main entrance to the school on Saylesville Road. (DPFOF ¶ 106.) Another student reported that there were twenty to twenty-five students at the main entrance near Saylesville Road at the time of the accident. (DPFOF ¶ 123.)

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). "A mere scintilla of evidence in support of the nonmovant's position is insufficient." *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  DISCUSSION

The plaintiffs assert nine causes of action against the defendants; however, the School District's and WGIC's motion for summary judgment is directed to only one of those claims—the claim alleging a violation of 42 U.S.C. § 1983.  The defendants seek dismissal of the plaintiffs' § 1983 claim because, according to the defendants, the plaintiffs cannot establish that the School District violated their substantive Due Process rights under the "state-created danger" exception to the general rule that the Due Process Clause of the Fourteenth Amendment generally does not impose upon the state a duty to protect individuals from harm by private actors, as set forth by the Supreme Court in *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189,195-96 (1989).  The plaintiffs oppose the defendants' motion on the grounds that triable issues of fact exist regarding whether the state-created danger doctrine applies in the context of this case.

### A.  Section 1983 Claim

To state a claim for relief under § 1983, a plaintiff must allege the following: (1) that she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was visited upon her by a person or persons acting under color of state law.  *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du lac*, 384 F.3d 856, 861 (7th Cir. 2004)).

Generally, a state is not obligated to protect the life, liberty, and property of its citizens against the invasion by private actors.  *Deshaney*, 489 U.S. at 195-96.  As stated by the Court, the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other."  *Id.* at 196.  However, from *Deshaney* arises two instances when a state has an affirmative duty, enforceable through the Due Process Clause, to protect individuals from harm: (1) when a "special relationship" arises between it and the victim; and (2) when the state

itself creates the danger imposed upon the individual, termed the "state-created danger" exception. *See id.* at 198-200; *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) (citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).

The Seventh Circuit established a three-part test by which to evaluate claims of liability under the state-created danger exception:

> First, in order for the Due Process Clause to impose upon a state the duty to protect its citizens, the state, by its affirmative acts, must create or increase a danger faced by an individual. Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual. Third, because the right to protection against state-created dangers is derived from the substantive component of the Due Process Clause, the state's failure to protect the individual must shock the conscience.

*King*, 496 F.3d at 817-18 (internal citations omitted). To succeed on a claim under the state-created danger doctrine, all three parts of the test must be satisfied.

**1. Affirmative Acts and the Creation of Danger**

To satisfy the first part of the test announced in *King*, a plaintiff must establish that affirmative acts taken by the defendant created or increased the danger to an individual. A key question in determining "whether state behavior violated the victim's constitutional right is: 'What actions did [the state actor] affirmatively take, and what dangers would [the victim] otherwise have faced?'" *Windle v. City of Marion*, 321 F.3d 658, 661 (7th Cir. 2003) (quoting *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998)). According to the court in *Windle*, state behavior violates a victim's constitutional right when the behavior enhances a danger, such that a victim would have faced "considerably less danger" if it were not for the state behavior. *See id.* at 661. Moreover, the failure to act does not fulfill the requisite that an act must be affirmative. "The term 'affirmative act' suggests a willful deviation from the *status quo*. Thus an affirmative act will have as a counterpoint a non-affirmative position. Typically, this involves inaction." *Id.* at 662 n.2.

8

There have been only a few instances where the Seventh Circuit found state behavior to have affirmatively created or increased a danger faced by an individual. An affirmative act was found in *Monfils*, in which an informant was murdered by a crime suspect after police officers gave a suspect a recording of the informant's voice, even though the informant begged police not to release the recording. It was also found in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), in which police officers left children alone in an abandoned car after arresting their uncle, who was driving the car. Finally, it was found in *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), in which an intoxicated driver caused a head-on collision after police officers arrested the original driver of a car, leaving the drunk passenger behind.

Here, the plaintiffs argue that the school district took affirmative acts that created danger to Samantha Gillard by implementing the senior campout, including "specifically authorizing the date of the event and hiring and paying for a security guard." (Pl.'s Resp. at 9.) The argument that such conduct created or increased danger to an individual is certainly weaker here than it was in *Monfils*, *White*, and *Reed*, where the victims would have faced considerably less danger had the officers not deprived car passengers of their driver without providing a viable alternative in *White* and *Reed*, or had the officers not released the tape recording in *Monfils*. Whether Samantha Gillard would have faced considerably less danger had the School District not ratified the senior campout is shrouded in much more uncertainty. Had the senior campout not taken place, Samantha Gillard would have still been susceptible to the dangers every motorist faces when behind the wheel, guarding against all dangers and distractions that inevitably surface on a day to day basis.

Additionally, the school administration restricted the campout to a specified encampment area and paid a security officer to ensure students stayed in that area. Thus, the School District did not in any way create or ratify a student wave at the conclusion of the campout event, which, in turn,

created a potential distraction for motorists along the roadway.

Nonetheless, even if ratification of the senior campout created an enhanced danger for motorists on Saylesville Road on May 21, 2007, thereby satisfying the first part of the state-created danger test, the plaintiffs' § 1983 claim would still be unsuccessful for failing to satisfy the second and third parts of the test.

**2. Proximate Cause**

More than a simple "but for" is required for a successful state-created danger claim. *See Sandage v. Bd. of Comm'rs of Vanderburgh County, Ind.*, 3:07-CV-0049-SEB-WGH, 2008 U.S. Dist. LEXIS 9072, at *14 (S.D. Ind. Feb. 6, 2008), *aff'd*, 548 F.3d 595 (7th Cir. 2008). Under the second part of the state-created danger doctrine, the plaintiff must be a foreseeable victim of the defendants' actions in a tort sense. *See Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). Foreseeability hinges on a number of limiting factors, including whether certain dangers are "familiar and specific" and limited in time and duration. *See id.* at 828-29. Another limiting factor of the proximate cause analysis is that the victim be within a definable group of people to which the defendant's conduct creates a foreseeable risk. *See id.* at 828. In sum, proximate cause "'is a fact specific inquiry, involving a consideration of time, geography, range of potential victims, and the nature of harm that occurred.'" *Id.* at 829.

For instance, in *Reed*, a drunk driver struck Reed's car after crossing the center line of the highway. Earlier that day, the drunk passenger was left behind after police arrested the original driver of the vehicle. The Seventh Circuit found that the dangers presented by drunk drivers were familiar and specific and that the plaintiffs were foreseeable victims because the drunk driver posed a danger to only motorists driving on the same highway. *See Reed*, 968 F.2d at 1127. Further, the dangers to other motorists were limited in both time and scope because the threat would be dispelled once

the drunk driver sobered up. *See id.* Thus, the plaintiffs sufficiently stated a claim that the state affirmatively created a danger for motorists on the roadway. *See id.*

In juxtaposition to the circumstances in *Reed*, in *Buchanan-Moore*, the plaintiffs claimed that Milwaukee County was responsible, under the federal civil rights law, for the death of Frank Moore ("Moore"). Moore was shot to death by a mentally ill man ("Gray") who broke into the home of Moore's neighbor shortly after he was released from the County jail following a seventy-two hour confinement during which the County failed to administer psychiatric medications to Gray. *See* 570 F.3d at 826-27. The Seventh Circuit found that the complaint did not allege facts that would suggest that "Gray's access to a gun, or propensity toward homicide, were specific dangers that were familiar to the County." *Id.* at 828. Moreover, the decedent was not a foreseeable victim because "a generalized, amorphous zone of danger is insufficient to trigger a state duty to protect." *Id.* Finally, the danger posed by Gray was "indefinite," and his mental illness and propensity for criminal acts existed "without temporal boundaries." *Id.* at 829.

Putting aside the limiting factors analysis, an examination of the threshold question of whether the School District's action was a "but for" cause of the collision reveals that this case is different from both *Reed* and *Buchanan-Moore* in one important respect. In both *Reed* and *Buchanan-Moore*, the "but for" connection between the state action and the end result, that being the collision in *Reed*, and the fatal shooting in *Buchanan-Moore*, was established. Here, however, it is not clear that the facts even establish a "but for" relationship between the state action and the end result. It cannot be said that, but for the senior campout, Samantha Gillard would not have been struck by oncoming traffic while turning into the main entrance of the school. According to Royer's deposition testimony, she saw approximately ten to fifteen students performing the wave near the road, but she was not watching them—she stated that she only glanced their way. (Royer Depo. at

11

46.) Moreover, Royer's testimony demonstrates that the intersection where this accident occurred caused problems in the past because people had pulled in front of her on several occasions. (*Id.* at 34.) Simply stated, even if students had not been engaged in the wave alongside the road, it is possible that this collision would still have occurred.

Nevertheless, even if the court were to accept that the campout was a "but for" cause of the collision, the proximate cause inquiry falls short of establishing anything more than a "but for" cause, and, as previously discussed, more than a "but for" cause is required for a successful state-created danger claim. *See Sandage v. Bd. of Comm'rs of Vanderburgh County, Ind.*, 3:07-CV-0049-SEB-WGH, 2008 U.S. Dist. LEXIS 9072, at *14 (S.D. Ind. Feb. 6, 2008), *aff'd*, 548 F.3d 595 (7th Cir. 2008).

The case at bar appears to fall somewhere between *Reed* and *Buchanan-Moore*. Like in *Reed*, if any danger was posed by the students at the campout, it was of fairly limited time and duration because the event was limited to the evening hours of May 20, 2007 and the early morning hours of May 21, 2007. Moreover, if the campout posed any danger to any individuals, it could be said that the most likely victims would be attendees or those coming within the vicinity of the location of the campout, including motorists on Saylesville Road. Therefore, it could be said that Samantha Gillard was arguably within a definable group of *potential* victims.

However, only with hindsight can it be said that the students performing the wave at the campout created a *potential* danger to Samantha Gillard on May 21, 2007. The school hired security out of a concern that a portion of the senior class was unpredictable or uncooperative, thereby suggesting that there was no telling what would have transpired over the course of the campout. Although senior campouts had been held on school grounds in the past, there are no facts suggesting the school should have been aware of any dangers posed to motorists on the roadway at the

12

conclusion of the campout.

It can be expected that an intoxicated driver may cause a motor vehicle accident, or that leaving children alone in a car will pose a danger to their physical and emotional well-being, or that releasing the recording of an informant who warns of the potential dangers will put the informant in danger. By contrast, it cannot be expected that simply allowing students to camp outside on school grounds for an evening will proximately cause a motor vehicle accident the following morning. The danger confronting Samantha Gillard on May 21, 2007 was not a specific danger that was familiar to the School District. Hindsight is not enough to satisfy the familiar and specific danger requirement. Because this limiting factor weighs heavily in favor the School District, the School District's actions were not the proximate cause of Samantha Gillard's injuries, at least for purposes of a § 1983 claim.

### 3. Conduct That Shocks the Conscience

The final part of the state-create danger test requires the state's conduct to shock the conscience. Whether the state's conduct shocks the conscience is "a necessarily fact-bound inquiry." *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007). When public officials are permitted the opportunity for "reasoned deliberation in their decisions," the official's conduct is conscious shocking when it "evinces a deliberate indifference to the rights of the individual." *Id.* at 819. If the circumstances "call for hurried judgments in order to protect the public safety or maintain the public order," rendering reasoned deliberation impractical, "conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury" to be deemed conscious shocking. *See id.* However, "in all cases, the conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 852-53 (1998)).

Here, the conduct at issue is the school administration's ratification of the senior campout on school grounds and its having provided inadequate supervision of the event. Even construing the evidence in the light most favorable to the non-moving party, the plaintiffs' proof demonstrates nothing more than mere negligence. There is no question that school officials were permitted time for reasoned deliberations in allowing the campout to occur. Applying this standard, there is no indication that the School District ratified the campout with deliberate indifference to the safety of its students, Saylesville Road motorists, or Samantha Gillard. Accordingly, the unfortunate chain of events leading to the accident cannot be characterized as anything but the result of negligence, and no reasonable jury could find that the School District's actions in ratifying the senior campout was conscience shocking.

Because the plaintiffs have failed to satisfy all three parts of the *King* test, they have failed to establish a constitutional injury under the state-created danger doctrine. Thus, the School District's and WGIC's motion for summary judgment dismissing the plaintiffs' § 1983 claim will be granted.

## B. State Law Claims

The plaintiffs also allege that the defendants' actions violated Wisconsin tort law. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction." Additionally, there is a presumption in favor of the district court relinquishing supplemental jurisdiction when the claim that is within the jurisdiction of the district court is dismissed before trial. *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995) (citing *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993)).

In this case, no good reason exists to exercise supplemental jurisdiction over the plaintiffs'

remaining state law claims. The federal claim is being dismissed at an early stage of the proceedings. Fact discovery is slated for completion in August 2010, and all other deadlines, including discovery as it relates to experts, is being held in abeyance per the court's order dated April 16, 2010. Because the litigation is in its initial stages, the court declines supplemental jurisdiction over the remaining state law claims and remands the state law claims to the state court from whence they were removed. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866-67 (2009) (finding that the exercise of jurisdiction over state law claims after dismissing every claim over which it had original jurisdiction is discretionary and that the relinquishment of supplemental jurisdiction is not based on a lack of subject matter jurisdiction for purposes of 28 U.S.C. § 1447(c) and (d)).

**NOW THEREFORE IT IS ORDERED** that the School District's and WGIC's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's § 1983 claim be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the plaintiffs' state law claims are **REMANDED** to the Waukesha Circuit Court for further proceedings.

**SO ORDERED** this 30th day of April 2010 at Milwaukee, Wisconsin.

**BY THE COURT**:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge